# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-2118

_____

State of Missouri

*Plaintiff - Appellant*

v.

Janet L. Yellen, in her official capacity as Secretary of the Treasury; Richard Delmar, in his official capacity as acting inspector general of the Department of the Treasury; U.S. Department of the Treasury

*Defendants - Appellees*

------------------------------

National Taxpayers Union Foundation

*Amicus on Behalf of Appellant(s)*

State of Arizona; State of Alabama; State of Alaska; State of Arkansas; State of Idaho; State of Kansas; State of Kentucky; State of Louisiana; State of Mississippi; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of Tennessee; State of Texas; State of Utah; State of West Virginia; Chamber of Commerce of the United States of America; National Federation of Independent Business Small Business Legal Center

*Amici Curiae*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: February 15, 2022
Filed: July 14, 2022

_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Missouri challenges the Secretary of the Treasury's implementation of the American Rescue Plan Act of 2021 (ARPA), Pub. L. No. 117-2, 135 Stat. 4. Missouri argues that the Secretary's "erroneously broad interpretation" of a provision in ARPA—the "Offset Restriction"—is unconstitutional. The district court[1] dismissed the case, finding that Missouri lacked standing and that Missouri's claims were not ripe for adjudication. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

ARPA, which was enacted in March 2021, appropriates over $200 billion to states, territories, and tribal governments to "mitigate the fiscal effects" of the COVID-19 pandemic. 42 U.S.C. § 802(a). Before an entity can receive funds, it must certify to the Secretary that it will comply with ARPA's provisions. Id. § 802(d)(1). ARPA funds must be used:

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

(B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

Id. § 802(c)(1).

ARPA also identifies two specific restrictions on the use of allocated funds. At issue in this case,[2] the Act's "Offset Restriction" provides:

A State or territory shall not use the funds provided under this section . . . *to either directly or indirectly offset* a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax . . . or delays the imposition of any tax or tax increase.

Id. § 802(c)(2)(A) (emphasis added). If a state violates the Offset Restriction, it "shall be required to repay the Secretary" an amount equal to the lesser of (1) "the amount of the applicable reduction to net tax revenue attributable to such violation," and (2) the amount of ARPA funds received by the state. Id. § 802(e).

---

[2]ARPA also prohibits states and territories from depositing ARPA funds into any pension fund. 42 U.S.C. § 802(c)(2)(B).

-3-

On May 17, 2021, the Department of the Treasury issued an Interim Rule implementing the Offset Restriction, 86 Fed. Reg. 26,786 (May 17, 2021), and on January 27, 2022, it issued a Final Rule, which went into effect on April 1, 2022,[3] 87 Fed. Reg. 4338 (Jan. 27, 2022) (31 C.F.R. § 35.1 et seq.). The Final Rule states that Treasury will consider a recipient to have impermissibly used ARPA funds to offset a reduction in net tax revenue if it fails to offset that reduction through means unrelated to the ARPA funds. More specifically, the Offset Restriction is violated if: (1) the recipient implements a change in law or regulation that the recipient assesses has had or predicts to have the effect of reducing tax revenue; (2) the reduction caused by the change is more than de minimis, meaning it exceeds one percent of the recipient's baseline tax revenue for 2019, adjusted for inflation; (3) the recipient reports a reduction in net tax revenue; and (4) the aggregate reduction is greater than the sum of other changes. 31 C.F.R. § 35.8(b). The "other changes" considered under the fourth element include increases in tax revenue, spending cuts in departments that do not utilize ARPA funds, and—in departments that do use ARPA funds—spending cuts that are greater than the ARPA funds used. Id.

## II.

Missouri filed suit on March 29, 2021, shortly after ARPA was enacted and before Treasury issued the Interim Rule implementing the Offset Restriction. In its complaint, Missouri describes two potential interpretations of the Offset Restriction. Under one, which it deems the "narrow" and "correct" interpretation, the Offset Restriction "merely prohibits the States from taking COVID-19 relief funds and deliberately applying them to offset a specific tax reduction of a similar amount." Under a second, "broad" interpretation, the Offset Restriction "would prohibit a State from enacting *any* tax-reduction policy that would result in a net reduction of revenue through 2024 or risk forfeiting its COVID-19 relief funds." Missouri

---

[3]The Interim Rule and Final Rule are substantially the same, though the Final Rule adds a requirement for ARPA recipients to exhaust certain procedures before seeking judicial review of a recoupment decision and amends slightly the definition of a "Covered Change." See 31 C.F.R. §§ 35.10(e), 35.10(g), 35.3.

alleges that several states contacted the Secretary for clarification about which interpretation Treasury would adopt. According to Missouri, the Secretary declined to endorse the narrow interpretation, and her response and subsequent public comments "generate[d] uncertainty, confusion, and doubt for state legislatures that are currently considering and debating tax-reduction policies."

Shortly after filing its complaint, Missouri moved for a preliminary injunction, asking the district court to enjoin any interpretation of the Offset Restriction "that is broader than prohibiting the deliberate and express use of the Act's relief funds to offset revenue losses from a specific tax cut" or, alternatively, to enjoin enforcement of the Offset Restriction as unconstitutional under the Spending Clause and the Tenth Amendment because it is an unclear condition on a congressional appropriation. The district court held a hearing on Missouri's motion on May 4, 2021. A week later, the district court dismissed the case, concluding that Missouri lacked standing and that the case was not ripe for adjudication because Missouri's alleged harm was too speculative, abstract, and remote. Missouri has since been allocated approximately $2.7 billion through ARPA and has received at least some of that funding.

III.

We review de novo a district court's dismissal of a case on standing or ripeness grounds. City of Kennett v. EPA, 887 F.3d 424, 430 (8th Cir. 2018).

We begin with standing. "Federal court jurisdiction is restricted to 'cases and controversies.'" Wieland v. U.S. Dep't of Health & Human Servs., 793 F.3d 949, 954 (8th Cir. 2015) (quoting Flast v. Cohen, 392 U.S. 83, 94 (1968)). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). In keeping with this purpose, the "standing inquiry has been especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by

one of the other two branches of the Federal Government was unconstitutional." Id. (quoting Raines v. Byrd, 521 U.S. 811, 819–20 (1997)).

"'The irreducible constitutional minimum of standing' requires: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that a favorable decision will redress the injury." Carson v. Simon, 978 F.3d 1051, 1057 (8th Cir. 2020) (per curiam) (cleaned up) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "Standing is to be determined as of the commencement of the suit," Iowa League of Cities v. EPA, 711 F.3d 844, 869 (8th Cir. 2013) (cleaned up) (quoting Lujan, 504 U.S. at 570 n.5), and it is the plaintiff's burden to establish these elements. Wieland, 793 F.3d at 954. However, the extent of that burden varies depending on the stage of litigation. At the dismissal stage, "the plaintiffs must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing." Animal Legal Def. Fund v. Vaught, 8 F.4th 714, 718 (8th Cir. 2021).

The district court concluded that Missouri had failed to allege an injury in fact. For this element, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Carson, 978 F.3d at 1057 (cleaned up) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016)). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper, 568 U.S. at 414 n.5). Thus, a plaintiff may still have standing to challenge the threatened enforcement of the law. Under this so-called "pre-enforcement test," the plaintiff must "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Id. at 159 (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)).

In its complaint, Missouri alleges that it has standing because, "[u]nder the threatened broad interpretation," the Offset Restriction would "injure Missouri and

other States by unconstitutionally intruding on their sovereign taxing authority, interfering with the orderly management of their fiscal affairs, interfering with state legislative functions, and creating the risk that the States may face forfeiture of billions of dollars in federal funds." Missouri also alleges that the broad interpretation "diminish[es] . . . Missouri's power to adopt tax policies as it sees fit." Finally, Missouri contends that "[t]he lack of clarity" provided by Secretary Yellen in her response to the inquiring states and in public comments about the Offset Restriction "inflicts immediate interference and irreparable injury" on Missouri's ability to dictate its tax policy and that her failure to embrace the narrow interpretation creates "uncertainty and confusion," which hampers Missouri's ability to consider tax-reduction proposals.[4]

On appeal, Missouri identifies five specific ways it has been injured: (1) the broad interpretation of the Offset Restriction punishes Missouri for exercising its constitutional right to set taxes; (2) the Secretary's "embrace of the broad interpretation" has harmed Missouri's interest in the offer Congress provided to the State; (3) Treasury's regulations make ARPA's requirement more onerous, leading to greater compliance costs; (4) under the broad interpretation, there is an increased chance Missouri will lose ARPA funds; and (5) under the pre-enforcement test, Missouri has alleged an intention to engage in conduct arguably affected with constitutional interest, but proscribed by statute, with a credible threat of enforcement hanging over it.

What Missouri's complaint and appeal make clear is that the State is not challenging the Offset Restriction as written, but rather a specific potential

---

[4]Missouri's argument is essentially that the Secretary's early comments about the Offset Restriction created confusion about how Treasury would enforce the provision. The Secretary has since issued the Interim and Final Rules, which set forth clearly how Treasury will determine whether a recipient of ARPA funds has violated the Offset Restriction.

interpretation of the provision—the "broad interpretation."[5]  In fact, Missouri explicitly states that its "suit challenges the threatened unconstitutional application" of the Offset Restriction.  The problem for Missouri, however, is that there is no threatened application of the broad interpretation.  The Secretary explained to the district court and to this court, and Treasury reiterated in the Interim and Final Rules, that the Secretary has never endorsed or adopted the broad interpretation.

Missouri's insistence to the contrary mischaracterizes the Interim and Final Rules and is premised on a shifting definition of the so-called "broad interpretation." In its complaint, Missouri defines the broad interpretation as "prohibit[ing] a State from enacting any tax-reduction policy that would result in a net reduction of revenue through 2024."  Yet the letter that Missouri and other states sent to the Secretary urged her to reject a broad interpretation that would "prohibit tax cuts or relief of any stripe."  Nevertheless, throughout this litigation, the Secretary has been clear that a recipient of ARPA funds will be deemed to have violated the Offset Restriction only if it cannot account for net revenue losses through non-ARPA sources.  And contrary to Missouri's position on appeal, Treasury has not adopted either version of the "broad interpretation" in its regulations implementing ARPA.

---

[5]After this case was argued and submitted, the Ninth Circuit held that Arizona had standing to challenge the Offset Restriction.  See Arizona v. Yellen, 34 F.4th 841 (9th Cir. 2022).  However, unlike Missouri, Arizona did not challenge a hypothetical "broad interpretation" of the Offset Restriction but instead argued that, *as written*, the Offset Restriction is unconstitutionally ambiguous and unduly coercive.  Id. at 852.  Missouri does briefly allege in its complaint that the Offset Restriction is unconstitutionally vague if it prohibits more than the deliberate use of ARPA funds to offset a specific tax reduction, and on appeal it asserts that it has a constitutional right to clarity regarding the conditions of congressional appropriations.  But it develops no argument as to how it has suffered a concrete injury under either of these theories, nor has it explained how such an injury could still exist after it has accepted the funds.  Instead, Missouri repeatedly argues that it is injured by a "threatened" "broad interpretation" that has never been adopted.

Moreover, although a plaintiff generally need not "confess that he will in fact violate [a] law" in order to challenge it, see Susan B. Anthony List, 573 U.S. at 163, a plaintiff must still allege "an intention to engage in a course of conduct . . . proscribed by a statute," id. at 159 (quotation omitted). Missouri has not alleged any intent to engage in conduct that is proscribed by the Offset Restriction on its face or the Secretary's interpretation of it. While Missouri's complaint alleges that its legislature was then considering tax-reduction policies, such policies alone do not violate ARPA or any interpretation of ARPA embraced by the Secretary. The Offset Restriction simply prohibits states from cutting taxes in a way that reduces net revenue more than a de minimis amount and then failing to account for that reduction through non-ARPA sources, such as through organic economic growth, increases in revenue from other sources, or spending cuts in sectors not related to ARPA. See 31 C.F.R. § 35.8(b). And although Missouri may have alleged that it intends to accept ARPA funds and that it is considering tax cuts, it has not alleged that those tax cuts would reduce net revenue and that it would fail to offset the reduction through permissible means.[6] Thus, it has not alleged any intent to engage in conduct that would likely subject it to recoupment of any ARPA funds.

Simply put, Missouri has only alleged a "conjectural or hypothetical" injury, not one that is actual or imminent.[7] See Carson, 978 F.3d at 1057 (quoting Spokeo,

---

[6]In fact, Missouri acknowledges in its briefing that its legislature is required to balance the State's budget every year. This suggests that whenever the legislature anticipates revenue decreases, it must find a way within its own budget to offset those decreases. What Missouri cannot do is use ARPA funds as part of that balancing process, such as by taking an action that reduces net revenue, cutting spending in departments related to ARPA, and then using ARPA funds to replace that spending. Missouri has not alleged that it plans to use ARPA funds in this way, nor does it have a "constitutional interest" in doing so. See Susan B. Anthony List, 573 U.S. at 159 (quoting Babbitt, 442 U.S. at 298).

[7]Although the Supreme Court has suggested that "States are not normal litigants for the purposes of invoking federal jurisdiction," Massachusetts v. EPA, 549 U.S. 497, 518 (2007), it has not eliminated the basic requirements for standing just because a state is the plaintiff, see id. at 521–23 (assessing injury, causation, and

578 U.S. at 339). It has also not alleged a future injury that is "certainly impending" or even likely to occur. See Susan B. Anthony List, 573 U.S. at 158. Instead, Missouri asks us to declare, in the abstract, what a statute does not mean. It asks us to enjoin a hypothetical interpretation of the Offset Restriction that the Secretary has explicitly disclaimed, without alleging any concrete, imminent injury from the Secretary's actual interpretation. That would be a quintessential advisory opinion. See Golden v. Zwickler, 394 U.S. 103, 108 (1969) (explaining that federal courts "do not render advisory opinions. For adjudication of constitutional issues[,] concrete legal issues, presented in actual cases, not abstractions are requisite. This is as true of declaratory judgments as any other field" (cleaned up) (quoting United Pub. Workers of Am. (C.I.O.) v. Mitchell, 330 U.S. 75, 89 (1947))); Ringo v. Lombardi, 677 F.3d 793, 796 (8th Cir. 2012) ("A federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." (cleaned up) (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975))). We thus conclude that Missouri has failed to establish that it has standing to bring its claims.

IV.

Because we conclude that Missouri has not alleged an injury in fact, we need not reach the question of whether its claims are ripe. See Summers v. Earth Island Inst., 555 U.S. 488, 500–01 (2009). The judgment of the district court is affirmed.

———————————————

redressability and concluding that Massachusetts, which owns a substantial portion of its coastline, had alleged a concrete and particularized injury from sea level rise along its coast). Here, even if Missouri "is entitled to special solicitude" in this standing analysis, see id. at 520, it has still failed to allege any intent to take action that would subject it to recoupment under ARPA or Treasury regulations.